STATE OF VERMONT
SUPERIOR COURT - ENVIRONMENTAL DIVISION

| | { | |
|---|---|---|
| In re Champlain Oil Co., Inc. | { | Docket No. 89-7-11 Vtec |
| Conditional Use Application | { | (Appeal from Ferrisburgh ZBA) |
| (After Remand) | { | |
| | { | |

## Decision on the Merits

Champlain Oil Company, Inc.[1] ("Applicant") seeks a municipal permit to construct and operate a multi-use facility, including a gasoline station, retail store, and restaurant ("the Project") on property located on the easterly side of U.S. Route 7 in the Town of Ferrisburgh ("Town"), just south of the Town center.

Additional parties to this appeal include fifteen individuals,[2] the Ferrisburgh Friends of Responsible Growth, Inc., and the Town of Ferrisburgh. Applicant is represented by Liam L. Murphy, Esq.; Cross-Appellants are represented by James A. Dumont, Esq.; the Town is represented by James F. Carroll, Esq. When the parties were unable, despite best efforts, to reach a voluntary resolution of all outstanding disputes concerning the proposed Project, the Court conducted a site visit and a multi-day merits hearing.

## Procedural Background

We first provide the following overview of the proceedings before the Town of Ferrisburgh Zoning Board of Adjustment ("ZBA") and this Court that concern the proposed Project, both in its current site version and a prior version of the Project Site. This procedural background lays a foundation for the legal issues to be addressed in this Merits Decision.

The ZBA first approved a prior version of the Project, with fourteen numbered conditions, on September 9, 2009. Applicant filed a timely appeal, contesting eight of those conditions. Ferrisburgh Friends of Responsible Growth, Inc. and the fifteen individual litigants ("Cross-Appellants") filed a cross-appeal of the ZBA's 2009 decision, raising a number of issues concerning the proposed Project's compliance with the Zoning By-Laws for the Town of

---

[1] Applicant's legal structure was represented at trial and in post-trial pleadings as both a Vermont corporation and as a subsidiary of a Vermont limited liability company: B. Cairns Property, LLC. Applicant's specific legal structure is not material to these proceedings.

[2] Those fifteen individuals are Terry and Debbie Allen, Judy Chaves, Don Dewees, Judy Elson, Todd Hardie, Katie Hill, Rick and Sally Kerschner, Rux Martin, Nick Patch, Karen Petersen, Kurt Plank, Jennifer Ruddy, and J. Silas Towler.

1

Ferrisburgh, Vermont ("Bylaws"). These appeals of the ZBA's 2009 approval were assigned Docket No. 200-10-09 Vtec.

After some brief discovery and preliminary settlement discussions, Appellants and Cross-Appellants filed competing motions for summary judgment, seeking a summary ruling on three distinct legal issues: (1) whether the proposed convenience store is a permissible use in the applicable zoning district; (2) whether the proposed restaurant may include a drive-up service window; and (3) whether the on-site wastewater and stormwater systems may be located partially within the Conservation Zoning District ("Conservation District").

The Court thereafter rendered a decision on these summary judgment motions, concluding that (1) the proposed convenience store may be classified as a "retail store," which is permitted as a conditional use in the Highway/Commercial Zoning District ("HC District"); and (2) a restaurant is also permitted as a conditional use in the HC District, even when the proposed restaurant includes a "drive-through" facility. In re Champlain Oil Co. Conditional Use Application, No. 200-10-09 Vtec, slip op. at 6–9 (Vt. Super. Ct. Envtl. Div. July 16, 2010) (Durkin, J.). However, the Court concluded that the Project could not be approved as proposed, since the lot to be created to host the proposed Project, including the wastewater and stormwater systems, would not conform to the minimum lot size requirements for the Conservation District.[3] Id. at 10–12.

Applicant then sought reconsideration of the Court's ruling, specifically requesting that the Court address the remaining legal issue of whether the Bylaws prohibit the siting of wastewater and stormwater treatment systems in the Conservation District for a commercial facility located in the adjoining HC District. The Court conducted a site visit and an in-person hearing on that motion and, after receiving the parties' arguments and conducting its own deliberations, ruled on the record of the September 7, 2010 hearing that the Bylaws do not prohibit the siting of wastewater and stormwater systems on a sufficiently-sized lot within the Conservation District.

Applicant also asserted at the September 7, 2010 hearing that it could acquire sufficient lands from an abutting property owner to create a lot for the Project that conformed to the

---

[3] The original lot proposed to host Applicant's Project straddled three zoning districts. See Champlain Oil Co., No. 200-10-09 Vtec, slip op. at 2 (Vt. Super. Ct. Envtl. Div. July 16, 2010). The most restrictive of these zoning districts—the Conservation District—required that newly-created lots contain no less than 25 acres.

2

minimum lot size for the applicable zoning districts. The Court concluded that while the Bylaws did not prohibit Applicant from making such a revision to their proposed plans, the Court should not be the first tribunal to consider such a significant revision. Rather, so as to allow the ZBA to have the first opportunity to provide public notice and consider such a revision, the Court **REMANDED** the application to the ZBA, so that the ZBA could conduct the first review of any revised site plan Applicant submitted. The Court summarized its legal determinations in an entry order issued the following day. See In re Champlain Oil Conditional Use Permit Application, No. 200-10-09 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Sept. 8, 2010) (Durkin, J.).

Applicant thereafter submitted a revised site plan to the ZBA, which considered it in connection with the remanded conditional use application. On May 4, 2011, the ZBA held a hearing to receive further testimony and other evidence, including Applicant's revised site plan and lot design. By decision dated June 1, 2011, the ZBA "CONDITIONALLY"[4] approved Applicant's conditional use application, noting that its approval incorporated the determinations and fourteen conditions that were a part of its prior approval of September 9, 2009. In re Champlain Oil Co. Conditional Use Application, No. 09-36.1, Findings of Fact and Conclusion, at 1 (Ferrisburgh ZBA June 1, 2011).

Applicant then filed a timely appeal of the ZBA's June 1, 2011 decision and submitted a Statement of Questions again challenging Conditions 1–4 and 6–9 of the ZBA's approval. Cross-Appellants filed a timely cross-appeal, posing eleven legal issues in their Statement of Questions. When the parties, despite their best efforts, were unable to resolve their disputes voluntarily, the Court conducted a second site visit and completed its merits hearing after four days of trial.

Based upon the evidence presented to this Court at its multi-day merits hearing, including that evidence which was put into context by the site visits the Court conducted with the parties, the Court makes the following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Decision.

---

[4] The ZBA conditioned its June 1, 2011 approval of Applicant's revised site plan "upon the approval by the Planning Commission of the lot line adjustments" proposed by Applicant. These lot line adjustments, the Zoning Administrator's and Planning Commission's approval of them, and the appeal to this Court of the Administrator's and Commission's approval are discussed in Findings ¶¶ 6–13, below.

## Findings of Fact

### I. The Project Site

1. The Project Site is on a parcel of land on the easterly side of Route 7, just north of Little Otter Creek. The site is approximately one half mile south of the Town center. The proposed site includes the approximate location of the former Ferrisburgh Roadhouse Restaurant, as depicted in photo Exhibits 35 and 36. A fire destroyed the Roadhouse Restaurant in 2007.

2. The site of the former Roadhouse Restaurant contains about 2.5 acres, the majority of which lies within the HC District. Although it was not expressly stated at trial, Applicant appears to have concluded that the former Roadhouse Restaurant site is too small to host the Project and has therefore sought to acquire additional lands from adjoining property owners.

3. The original restaurant operating at the former Roadhouse Restaurant site opened in the 1950's under the name Stewart's Restaurant. In 1989, Gregory and Susan Burdick purchased the property, changing the name to Burdick's Country Kitchen Restaurant and serving locals, tourists, travelers, and truckers twelve months of the year, from 6:00 AM to 9:00 PM. The Burdicks expanded the gravel parking area, as depicted in the aerial photo admitted as page 2 of Exhibit 4, so as to accommodate the automobiles, commercial trucks, and tractor trailers that their customers drove to the Restaurant. Photos of Burdick's Restaurant in its heyday were admitted at trial as Exhibits 3–6, and 37.

4. The Burdicks operated their restaurant for sixteen years, and at the time of its sale in 2006 to Marcos and Claudia Llonas it was a well-known establishment, frequented by many patrons. The Llonases owned the property at the time of trial.

5. The Ferrisburgh Roadhouse Restaurant and its predecessor (Burdick's Country Kitchen Restaurant) had seating for 99 patrons.

6. Applicant submitted a 28-sheet set of drawings to identify its plans for creating the proposed lot for its Project and to provide the details of its proposed development, landscaping, and wastewater and stormwater treatment systems. This set of drawings was admitted at trial as Exhibit 12.

7. The Burdicks own a separate parcel of undeveloped land that lies behind and easterly of the Llonases' property; the Burdicks' property also has frontage on Route 7. The Burdick parcel contains about 24.27 acres and lies partially in the HC District, the Conservation District, and the Rural Agricultural Zoning District ("RA District").

4

8.      Applicants propose to assist the Burdicks in subdividing their land into two parcels: one parcel, adjacent to the Llonases' property, will contain 7.2± acres; the remaining parcel will contain 17.07± acres. These two new lots of the Burdicks' land are depicted on pages 2 and 3 of Exhibit 12.

9.      At Applicant's suggestion and direction, the Burdicks have agreed to sell the first parcel (containing 7.2± acres) to the Llonases, who have agreed to merge that land with the property they own, thereby creating a larger parcel containing 9.7± acres. Applicant intends to acquire this 9.7± acre parcel from the Llonases to use as the site of Applicant's proposed Project. See Exhibit 12 at 3. We hereinafter refer to this to-be-merged lot of 9.7± acres as "the Project Site."

10.     The Burdicks' remaining parcel (containing 17.07± acres) abuts a larger parcel of land belonging to Allandra Farm, Inc. At Applicant's suggestion and direction, the Burdicks have agreed to convey their remaining 17.07± acres to Allandra Farm, Inc. for the purpose of merging those acres with Allandra's adjoining land, to form a larger parcel containing 179.1± acres. See Exhibit 12 at 2.

11.     Applicant applied for approval for the Burdicks to subdivide their land into these two lots, with the intention of the land being merged with adjoining lands, as noted above in Findings ¶¶ 6–9. On January 23, 2012, the Town of Ferrisburgh Zoning Administrator and the Town of Ferrisburgh Planning Commission ("Planning Commission") approved the above-described subdivision and merger/lot line adjustments by and between the Burdicks, the Llonases, and Allandra Farm, Inc.

12.     Cross-Appellants filed a timely appeal with this Court of the Zoning Administrator and Planning Commission approval. That appeal was docketed as In re Champlain Oil Lot Line Adjustments,[5] No. 23-2-12 Vtec (Vt. Super. Ct. Envtl. Div.).

13.     Cross-Appellants initially challenged the legality of the approved lot line adjustments. However, by Stipulation, which the Court incorporated into its own Order dated April 9, 2012, Cross-Appellants agreed (1) to voluntarily dismiss their appeal of the boundary line adjustment approval and (2) that the Planning Commission's approval could be admitted as evidence in support of Applicant's conditional use approval application that is the subject of this Docket (No. 89-7-11 Vtec). Applicant agreed that this dismissal of the boundary line appeal would not

---

[5] The Court has previously listed this appeal as "In re Champlain Oil CU—After Remand." The undersigned directed that this appeal be re-titled to more accurately note the subject of that appeal.

inhibit Cross-Appellants' challenge to the compliance with setback and other Bylaw provisions relevant to Applicant's conditional use approval request.

14. Based upon these representations, the parties' Stipulation, and this Court's April 9, 2012 Order in Docket No. 23-2-12 Vtec, the Court has accepted into evidence a copy of the Zoning Administrator/Planning Commission boundary line adjustment approvals, now marked and admitted as Exhibits 12A and 12B.[6]

15. The proposed Project Site, once these conveyances are completed, will contain 9.7± acres, which size will exceed the minimum lot size requirements for the HC District (2 acre minimum) and the RA District (5 acre minimum). The proposed Project Site is located only in these zoning districts.

16. Although a small portion of the Project Site, located in the northeastern corner, is located in the RA District, Applicant does not propose any development in that portion of the lot.

17. The Project Site will have in excess of 1,153 feet of frontage on Route 7, thereby exceeding the minimum road frontage requirement for the HC District (300 feet).

18. Due to their ownership of the lands proposed for the Project Site, both Mr. and Mrs. Llonas and Mr. and Mrs. Burdick have joined Applicant as co-applicants on the pending application. Mr. Llonas and Mrs. Burdick testified in support of the application, but do not have a material interest in the development and operation of the proposed Project. They and their spouses will benefit if the Project is approved, because the above referenced land transfers to Applicant are conditioned upon the Project's approval.

## II. The Area Impacted By Applicant's Project

### a. Area within the vicinity of the Project Site.

19. Route 7 is a major north/south corridor for commercial, industrial, retail, and residential travel parallel to the general western border of Vermont, including through the Town of Ferrisburgh. This state highway often has only one travel lane in each direction, with occasional passing lanes and paved breakdown lanes. There are some portions of Route 7 that have the characteristics of an interstate highway. However, many sections of Route 7 pass

_____

[6] Exhibits 12A and 12B are copies of the same subdivision/boundary line adjustment maps depicted on pages 3 and 4 of Exhibit 12, but also contain a pre-printed stamp and signature to denote Planning Commission approval.

6

through the center of small, quaint villages that even today retain their rural charm. The center of the village of Ferrisburgh is such an area.

20. The Project is located about a half mile south of the village center. Approaching the Project Site from the south, a traveler witnesses various commercial and residential properties along a typical rural highway. This portion of Route 7 is generally wider than in the village center. Many (although not all) of the properties in this commercial district host commercial developments, such as Mid-State Sports, the Dock Doctors, Vermont Energy Co. gas station and convenience store, Mailloux's Honey Gardens, Sky View Motel,[7] Eriksen's Marine, and BC Motorsports. See Exhibit 29, slide 24.

21. Route 7 and the commercial, industrial, retail, and residential traffic that uses this portion of that roadway largely define the Project neighborhood.

22. This section of Route 7, south of the village center, also contains some private residences, yet the area presents itself as more commercial in character. Although Cross-Appellants correctly note that there are more individual residences than individual commercial sites in the vicinity of the Project Site, the commercial properties encompass the majority of physical space in the highway area that is south of the village center. Exhibit 29, slide 24. The HC District has considerably more of a commercial appearance than a residential appearance.

23. While Route 7 in the vicinity of the Project Site contains only one travel lane in each direction, it has wide travel lanes and wide shoulders on each side, consistent with a typical commercial section of a large rural highway. Some patrons of the area's commercial properties, including the Vermont Gas Co. gas station and convenience store, located diagonally across from the Project Site, sometimes use these wide highway shoulders along Route 7 for temporary parking. See Exhibit 24, slide 4.

24. Slide 24 of Exhibit 29 provides a helpful assessment of the commercial properties in the vicinity of the Project Site. It credibly counters Cross-Appellants' assertions that the Project would be significantly larger than commercial properties in this area of Town. While the Project, if developed, will encompass a large area, it does not exceed the physical space encompassed by several of the nearby commercial properties.

25. The existing commercial properties in the vicinity of the Project Site vary in height, style, and setback from the highway right of way. Some of these commercial properties, including the

---

[7] The Sky View Motel is currently being re-developed as a new location for the Dock Doctors business, which will include a larger set of buildings. See Exhibit 29, slide 32–37.

nearby Vermont Energy Co. convenience store and gas station, appear to be converted from residential to commercial use. Other commercial properties, including the existing Dock Doctors, BC Motor Sports, and Eriksen's Marine facilities, have distinctly commercial structures. See Exhibit 24, slides 2, 6; Exhibit 29, slide 11, respectively.

26.     Slide 42 of Exhibit 24 provides a credible comparison between the proposed Project and some of the existing commercial properties in the HC District. This comparison shows that other commercial properties exceed the proposed Project in (1) building area; (2) building height; and (3) total impervious surface. Id.

27.     Most commercial properties along Route 7 in the HC District have exterior lighting fixtures that illuminate these properties during business hours; some lights at some of the existing commercial properties remain on even after the businesses have closed for the evening. The types of exterior lighting vary (e.g., incandescent, florescent, and LED[8]); some lighting fixtures shield the bulb, but many of the existing lighting fixtures do not. See Exhibit 29, slides 21–23.

28.     All properties in the vicinity of the Project Site that have frontage on Route 7 are located in the HC District. Some of these commercial properties are set close to the roadway (i.e., within 40 feet from the center line of Route 7); some are set farther away from the roadway, including in excess of 100 feet, which is the current minimum setback for the HC District.

29.     Nearly all commercial properties in the vicinity of the Project Site have parking areas in the front or sides of their buildings. See Exhibits 24, 29. Several of the commercial facilities provide for parking in the rear of buildings, although most do not. Id. Some commercial properties have just a few delineated parking spaces for their customers, some have no delineated parking areas, and some commercial properties have thirty or more delineated parking spaces. The former Burdick's Country Kitchen Restaurant (the site for the proposed Project) had un-delineated parking areas that could accommodate 43 or more parked vehicles. See Exhibit 29, slide 4.

30.     Traveling north from the Project Site, properties along Route 7 remain located in the HC District until one reaches Little Chicago Road to the west and Middletown Road to the east.

---

[8] Light-emitting diodes ("LEDs") provide light from commercial fixtures that is similar, but not identical to light provided by incandescent and florescent bulbs, but LEDs also do so at a significantly reduced energy use. The proposed Project provides the only example of LED exterior lighting in the area, according to trial testimony.

This junction area is collectively known as "the Crossroads" and marks the transition from the HC District to the Village Zoning District ("Village District").[9]

31. The HC District is one of the smallest districts delineated in the Bylaws. See Zoning Districts map attached as the first Appendix to the Bylaws (Exhibit 1 at 69). The Village District also represents one of the smallest segments delineated on the Zoning Districts map. Id.

### b. Village District and its distinguishing characteristics.

32. Route 7 narrows in width as it enters the Village District. The travelled portions of the roadway narrow and the highway shoulders quickly narrow and then are replaced by curbing and sidewalks in most portions of the Village District.

33. The HC and Village Districts are very distinct, so much so that an unfamiliar visitor to the area could easily note the transition between the two Districts, even if not familiar with the Zoning Districts map. Residential buildings are more prominent in the Village District than in the HC District; the residential and commercial buildings in the Village District are set closer to the highway and are aligned more closely to each other than in the HC District. The current minimum setback for the Village District is 100 feet, although most of the preexisting properties in the Village District appear to be much closer to the centerline of Route 7.

34. The historic developments that predominate the Village District help define its character. Many of the buildings, even if now committed to commercial uses, retain physical characteristics of an historical rural village center populated by residential structures. Conversely, there are few examples of this quality in the HC District. The Village District retains the character of a village center; the HC District presents more as an area established for highway-orientated commercial developments and uses, albeit in a rural area.

35. The Village District's roadside trees and civic buildings further distinguish it from the HC District. Both Applicant's and Cross-Appellant's experts (Mr. Steele and Ms. Vissering, respectively) agree on the distinctive nature of the Village District. However, Ms. Vissering appears to argue that the HC District should also reflect historic and village center type characteristics. We find Mr. Steele's characterization of the distinctive nature of the HC District more credible and more strongly supported by the commercial development that exists and has been permitted in the HC District.

---

[9] Several exhibits also refer to the Village District area as the "Civic Center." We use the term Village District to refer to the specific area delineated on the Zoning Districts map attached as the first Appendix to the Bylaws.

9

36. The Town of Ferrisburgh Town Plan ("Town Plan") evidences several aspirational goals for the type of development that the community believes "should" occur in both the HC and Village Districts. Town Plan § 4.3. The Town Plan expresses the aspiration for the HC District that "[a]ll uses in this area should be conditional, and include only small-scale commercial enterprises and mixed uses typical of a 19th century highway crossroads area." Id. The Town Plan also recommends that "the visual character of this entrance to the town [is an] issue[] of concern that should be addressed by the town's regulations to maintain historic character." Id.

37. All uses allowed in the HC District are regulated as conditional uses. Bylaws § 4.4. However, the Bylaws do not appear to contain specific regulatory restrictions that would implement the aspirational goals evidenced in the Town Plan to limit permitted development to "small-scale commercial enterprises and mixed uses typical of a 19th century highway crossroads area." Town Plan § 4.3(G).

38. Many—perhaps most—of the existing and recently permitted area commercial developments are of a character that would not be found in a rural 19th century crossroads area; the existing or recently permitted uses include an ATV sales and service facility (BC Motor Sports); power boat sales, supplies, and service (Eriksen's Marine); marina dock sales (Dock Doctors, Inc.); and a gas station/convenience store facility (Vermont Gas Co.).

39. Applicant asserted, and Cross-Appellants contested, that the convenience store component of their proposed Project is a modern-day version of the general stores that once characterized 19th century highway crossroads areas. We are not wholly in agreement with this analogy, but to the extent the analogy is appropriate in relation to the existing Vermont Energy Co. convenience store and other similar facilities to the south and north of the village center, the analogy is also appropriate for the proposed Project.

III. The Project Components

a. Building, gas pumping stations, and canopies.

40. Applicant's revised Project plans (Exhibit 12, consisting of 28 separately lettered sheets) provide a detailed overview of the proposed Project, as well as specifics on the locations, dimensions, and components for the main building, the gas and diesel pumping stations, the canopies over the gas and diesel stations, the parking areas, and the treatment systems for wastewater and stormwater. See Exhibit 12, plans SP1C – SP8C.

10

41.     Although the proposed Project Site contains 9.7± acres, the principal components of the proposed Project (i.e., the building, gas and diesel pumping stations, related overhead canopies, and parking areas) are located on a 2.73± acre portion on the northern edge of the Project Site. This clustering of the Project components that are above grade and therefore readily visible from off of the Project Site help lessen the Project's visual impact and cause that visual impact to be similar to nearby commercial properties.

42.     The 2.73± acre portion of the Project Site, where all the visible portions of the Project are to be constructed, is entirely located in the HC District. Further, the wastewater and stormwater treatment systems, all of which are to be located at or below the finished grade of the Project Site, are also only located in the HC District.

43.     Applicant proposes eight gas pumping stations, located on either side of four pumping islands. The gas pumping stations and the canopy over those stations will be located in the forefront of the lot. See Exhibit 12, plan SP2C. The gas pumping stations and canopy will be located no closer than 100 feet from the center line of Route 7, so as to comply with the minimum front yard setback requirements for the HC District. Bylaws § 4.4(C).

44.     Gas pumping stations for most gas stations in Vermont are located in either the front or side areas of their main buildings, so as to allow the travelling public to readily determine that gas sales are available at that location. Cross-Appellants suggested that the proposed Project should be reconfigured, so that the building would be the portion of the facility closest to the highway and that the gas pumps be located in the rear of the building. No evidence was presented of another Vermont gas station configured in such a manner. We are not convinced that this realignment would materially change the appearance of the proposed Project. Rather, this reconfiguration may only cause confusion for the travelling public, who would be trying to determine whether gas was sold at the Project Site.

45.     A canopy also will be constructed so as to provide some protection from the elements within a walkway that runs from the front of the building to the gas pumping stations. See Exhibit 12, sheet SP2C.

46.     On either side of three diesel pumping islands, Applicant proposes six pumping stations where passenger vehicles, trucks, and tractor trailers may purchase diesel fuel. A canopy will also be constructed above the diesel pumping stations. Id.

47.     Applicant's principal agent, Mr. Carnes, credibly testified that diesel fuel is estimated to account for twenty to twenty-five percent of the fuel sales at the Project. The need for diesel fuel sales in this area was verified by convincing testimony that more cars and trucks, including tractor trailers, are consuming diesel fuel because of its increased cleanliness and mileage efficiency.

48.     The diesel pumping stations will be located off of the south side of the building, within walking distance to the building, but at a distance sufficient to provide both space for automobile parking near the building as well as turning and parking areas for tractor trailers. There will also be a canopy above the diesel pumping stations.

49.     The design for the canopy above the gas pumping stations will include a peaked and hipped[10] roof, with the spine of the peak running parallel to Route 7. This canopy will be 24 feet tall at its peak, which will match the height of some nearby commercial buildings. Several other nearby commercial buildings have taller peaked roofs. See Exhibit 29, slide 42.

50.     A peaked-roof canopy will run perpendicular to the gas canopy and will be attached to the building roof. That peak will not be as tall as the gas station canopy or the peaked roof on the building. Exhibit 29, slide 45 contains an artistic rendering of how the building, gas pumping stations, these two adjoining canopies, landscaping, and signage will appear. The multiple peaked and hipped roofs will help soften the visual presence and mass of the proposed Project components.

51.     The design for the canopy above the diesel pumping stations will also include a peaked and hipped roof, with a spine running perpendicular to Route 7. This canopy will be 25 feet tall at its peak.

52.     The proposed building will contain 4,800 square feet; approximately half of the building would be used as a retail store and half would contain a restaurant, perhaps of the "fast-food" variety, such as a McDonald's, Wendy's, or Subway Sandwich Shop.

53.     The building roof will be peaked, with the spine of the roof running parallel to the gas pumping station canopy, and parallel to Route 7. The building, canopies, and their roofs will be lighter and darker shades of gray, with white trim on the building corners and bottom edge of

---

[10] A roof that has sloping ends, rather than a peak that runs the full length of the roof, is said to be a peaked and hipped roof. See Exhibit 29, slide 55 for a demonstrative showing of the peaked and hipped roof on the proposed gas pumping station canopy. Note that while the peaked roof on the building does not run the full length of the building, it is not designed to be a hipped roof.

the canopies. These colors will appear muted (that is, not glaring or contrasting to surroundings) and will provide a blending of the structures with their surroundings.

54. The retail store, which Applicant often characterizes in its application materials as a "convenience store," would occupy 2,600 square feet and would serve a number of purposes. It would provide space for the gasoline station's cashier, space for storage, an office for the gasoline station, and equipment related to the gasoline station. It would also include space for the sale of retail goods, including automotive items such as motor oil and ice scrapers, as well as general retail items, such as groceries, beverages, and snacks. A typical retail store associated with other Champlain Oil gasoline service stations will stock over 6,000 different items (e.g., mittens, movies, batteries, pliers, coolers, candies, drinks, and novelty collectables).

55. The proposed restaurant will have thirty-four seats and comprise the building's remaining 2,200 square feet. It will also have a drive-up service window accessed by a drive-through lane that wraps around the outside of the rear of the building. The proposal appears much like a typical "drive-through" at a fast-food restaurant, where customers remain in their vehicles and review a menu-board at the rear of the building before ordering through a microphone. They then proceed to the drive-up service window where they stop, pay for the order, and receive their food. Applicant's site plans delineate a space in front of the service window where customers will wait temporarily as their orders are processed. See Exhibit 12, sheet SP2C.

56. The building, gas and diesel pumping stations, and related canopies are located at or beyond the 100-foot front yard, 50-foot rear yard, and 25-foot side yard setback minimums established for the HC District.

**b. Wastewater and stormwater treatment systems.**

57. On-site wastewater and stormwater treatment systems will serve the Project. These treatment systems will be installed at or below the finished grade of the Project Site and will not be discernible, except to the expert or well-trained eye.

58. Applicant has received approval for both systems from the Vermont Agency of Natural Resources, Department of Environmental Conservation ("DEC").

59. A preexisting wastewater treatment system on the Project Site once served the 99-seat Ferrisburgh Roadhouse Restaurant and a single family home that still exists on the Llonases' property. Applicant cannot use that preexisting wastewater treatment system for its gas station,

13

convenience store, and 34-seat restaurant, even though its wastewater production is estimated to be lower than that of the preexisting restaurant and house, because the prior system has failed. Applicant therefore applied to replace the preexisting wastewater treatment system with a new system that is sufficient in size to adequately treat the estimated flows of wastewater from the proposed Project.

60. DEC approved Applicant's proposal, including Project plans, for an on-site wastewater treatment system on August 18, 2011, as is evidenced by Wastewater and Potable Water Supply[11] Permit #WW-9-1609, a copy of which was admitted as Exhibit 16. The wastewater system includes the following components: wastewater collection in a series of underground pre-cast concrete tanks for initial wastewater collection, a pre-treatment system, and a mounded leach field. See Exhibit 16 at 4; Exhibit 12, sheets SP2C, XS1C, XS2C, D1C–D6C.

61. As designed, the wastewater treatment system initially delivers wastewater from the Project building to an underground tank that separates grease contained in the wastewater. Exhibit 12, sheet SP2C. Next, the wastewater flows to the remaining system components. Those components include a tank that houses a Micro-Fast bio-digestion system that acts to partially treat the wastewater. Exhibit 12, sheet D11C. The partially treated wastewater then flows through a pumping station for delivery to the leach field. Exhibit 12, sheet SP1C.

62. Sand and soils will be brought on site to construct the earthen mound for the leach field portion of the wastewater treatment system. The earthen mound will be constructed on the down-sloping soils existing on the southern portion of the Project Site. The leach field will be located entirely in the HC District and outside of the minimum side and rear yard setbacks.

63. The base or toe of the mounded soils will extend beyond the perimeters of the leach field in a gentle slope; a small portion of the mound will extend into the RA District. No portion of the leach field or the sloping soils beyond its perimeters will be located in the Conservation District.

64. The leach field and sloping soils will be located entirely within the Project Site, with the leach field no closer than 25 feet from any boundary line and the sloping soils of the mound being no closer than 10 feet from any boundary line.

---

[11] Potable water for the Project will be supplied by connection to the Vergennes-Panton Water District's municipal water system. Exhibit 16 at 3.

65. If constructed and maintained according to the Project plans and Permit #WW-9-1609, no wastewater will flow off of the Project Site without first being adequately treated on the Project Site. The water treated through the wastewater system will thereafter become part of the groundwater that flows beyond the Project Site.

66. A Class II wetland extends onto the southeastern corner of the Project Site. The proposed earthen mound for the leach field will abut this Class II wetland and encroach into its buffer area. Exhibit 12, sheet SP3C. The wetland continues onto the lands southerly of the Project Site, in the direction of nearby Little Otter Creek. Exhibit 12, sheet SP1C.

67. Applicant applied for and obtained a permit from DEC to encroach into the buffer of this Class II wetland, to the extent shown on its Project plans. DEC issued Individual Wetland [Buffer Encroachment] Permit #2011-132, a copy of which was admitted as Exhibit 18. As is evidenced by this Permit, the DEC determined that Applicant's planned encroachment into the buffer for this Class II wetland "will have no undue adverse effects on the protected functions and values of the subject significant wetland and associated buffer zone, and adjacent wetland complex, provided the project is conducted in accordance with" the Project plans and other conditions enumerated by DEC in its Permit. Exhibit 18 at 1–2.

68. Cross-Appellants' expert (Dr. Miles Waite) expressed concerns about the flow of what he referred to as "highly treated effluent" from the mound system, but he agreed that it was proper for DEC to issue Permit #WW-9-1609. Dr. Waite has some experience and expertise in the study of how water flows through underground soils and rock, but he is not an expert in the design or assessment of wastewater or stormwater treatment systems. While his testimony was intriguing, it was less persuasive than that of Applicant's experts (Messrs. Revell and Pitrowiski) and the DEC determinations evidenced by Permits # WW-9-1609 and #2011-132.

69. Cross-Appellants also expressed their concerns, presented solely through the testimony of Dr. Waite, that despite the DEC approval of Applicant's wastewater treatment system, Applicant's proposed system is likely to fail and cause discharge of wastewater before it has an opportunity to properly leach through the mound and resident soils for treatment. We found Messrs. Revell and Pitrowiski's assurances about the wastewater system's proper performance more credible and persuasive and reject Dr. Waite's suggestions of probable system failure.

70. The parties' experts spoke of a "wetting front" area, approximately 30 feet in width, where the treated water flows from the leaching mound area and becomes integrated into the

15

groundwater flowing off of the Project Site, onto adjoining lands, and perhaps eventually into nearby water courses, including Little Otter Creek. Based upon this expert testimony, we conclude that the groundwater flowing off the Project Site is indistinguishable, even though it may contain water once treated through Applicant's wastewater treatment system, once it leaves the Project Site.

71.     DEC also approved Applicant's proposal for an on-site stormwater treatment and discharge system on June 1, 2011. A copy of this DEC approval (Permit #6563-9015) was admitted as Exhibit 17. This Permit authorizes Applicant to treat and discharge stormwater pursuant to General Permit No. 3-9015 and subject to the condition that the stormwater treatment system is "constructed and operated in accordance with the site plans and details" submitted by Applicant. Exhibit 17 at 1. The plans submitted by Applicant in support of its stormwater treatment permit application were designated as SP1B, SP2B, SP3B, SP5B, SP7B; D6B, D10B, "as revised" and with "all supporting information." Id. Exhibit 12 contains the revised versions of the sheets that are referenced in Permit #6563-9015.

72.     Sheet SP1C of Exhibit 12 provides an overview for the Project components, including the stormwater treatment system. That system is designed to channel runoff from the paved areas surrounding the gas and diesel pumping areas into two underground tanks designed to separate grit, oil, and water that compose the stormwater runoff from the Project Site. See Exhibit 12, sheet D6C, detail 1. Once the stormwater flows through these grit and oil separators, it continues to the stone—and grass—lined forebay area above a proposed detention pond, as depicted on Exhibit 12, sheets SP1C–SP3C. As designed and approved by Permit #6563-9015, the proposed forebay area and detention pond will separate or remove remaining materials from the stormwater through evaporation and settlement.

73.     The detention pond is also identified as a "wet pond" on the Project plans. Exhibit 12, sheets SP1C and SP3C. The pond will sometimes, particularly during storms at one-year and greater maximums, contain a pool of stormwater, thereby facilitating the removal of materials from the stormwater through settlement. Stormwater will be detained in the pond and will not drain from it until water reaches the top of a drain pipe system, located at the southern end of the pond. This pond draining system will minimize the draining of stormwater sediments from the pond. Exhibit 12, sheet D10C, detail 1.

16

74.     The stormwater will then flow through a swale constructed of riprap rock along the eastern boundary of the Project Site. Exhibit 12, sheet SP2C. Geosynthetic fabric or its equivalent will first be placed on the area excavated for the riprap swale, so as to limit the integration of stormwater with groundwater. Exhibit 12, sheet D10C, detail 2.

75.     At the request of DEC officials, Applicant added a 200 foot-long wall made of concrete blocks (2 ft. in height by 2 ft. in width by 4 ft. in length) between the eastern edge of the rip rap swale and the eastern boundary of the Project Site. See Exhibit 12, sheet SP3C. The wall will be installed so that the top of the concrete block wall will be aligned with the finished grade of the surface area of the rip rap swale. The purpose of the concrete block wall is to direct the stormwater and segregate it from any groundwater in the vicinity of the swale.

76.     Cross-Appellants' expert (Dr. Waite) initially expressed concerns about the possibility of stormwater flowing from the Project Site and onto adjoining lands to the east that are located in the adjoining Conservation Zoning District, but he appeared to conclude that his concerns would be adequately addressed by the inclusion of the concrete block wall, suggested by DEC officials. [12]

77.     Any stormwater that makes it to the top of the wet pond drain and travels the full length of the rip rap swale will then flow in to a wide dissipater that will diffuse the flowing stormwater and reduce its energy before any remaining stormwater then flows into the nearby lands, including a wetlands buffer. Stormwater, after flowing through and over these treatment systems, may flow into Little Otter Creek, as is authorized by Stormwater Permit #6563-9015.

78.     Stormwater discharge from the detention pond, through the rip rap swale and dissipater and on to adjoining land is highly unlikely, even in the event of a storm equivalent to Tropical Storm Irene of August 28, 2011, due to the detention capacity of the proposed pond and related system components.

79.     Stormwater runoff from the Project Site will be significantly less than that which currently exists, even in light of the commercial development of the Project Site, due to the design of the Site generally and the stormwater treatment system in particular.

---

[12] Dr. Waite admitted to his lack of experience, formal training, or expertise in the fields of stormwater management and treatment. His admissions led the Court to be concerned about his assessments of the stormwater components in Applicant's proposed Project.

### c. Parking, signage, site circulation, traffic, noise, and operation hours.

#### i. *Parking*

80. Parking is proposed for 54 vehicles at various locations throughout the Project Site, as depicted on Exhibit 12, sheets SP2C and SP2C-TR. Eight spaces will be located along the front of the building, facing Route 7; 15 parking spaces will be located behind the building; 14 parking spaces to the north of the building; and 11 spaces to the south of the building. Id. There will also be four parking spaces for tractor trailers or large trucks to the south of the diesel pumps. Id.

81. Dispersing the available parking spaces to these five different locations on the Project Site minimizes the visual impact of the Project parking.

82. The Project's capacity to host parked cars (54 parking spaces) is only slightly greater than the capacity of the Project Site when it hosted the former Burdick's and Ferrisburgh Roadhouse Restaurants. See Exhibit 29, slide 4. Many nearby commercial properties may have fewer designated spaces for parked cars, but the cars parked in those other commercial parking areas are as or more visible from Route 7 as the parking spaces on the Project Site.

83. Existing and proposed plantings and landscaping, referenced below in more detail, will screen nearly all of the proposed parking spaces on the Project Site and will partially screen the vehicles that use those parking spaces.

#### ii. *Signage*

84. A sign remains on the Project Site from when the Ferrisburgh Roadhouse Restaurant was in operation. This sign references the name of that former establishment, provides a brief listing of what it served for food, and notes that the former restaurant was open for "Breakfast•Lunch•Dinner." See Exhibits 35,[13] 36.

85. The existing Roadhouse Restaurant sign is mounted on two posts, secured to either end of the sign, which raise the sign up approximately eighteen feet from the ground. The sign covers 52.5 square feet of space. The lettering is on both sides of the sign.

86. This sign is located off to the side and in front of the former restaurant; it is located within the existing 100-foot setback from the center line of Route 7 and is therefore a preexisting non-conformity.

---

[13] Two Exhibits 35 were admitted into evidence at trial. The Exhibit referenced here is a photo of the Ferrisburgh Roadhouse Restaurant sign.

87. This sign also has lighting fixtures attached to it that appear to have been used to illuminate both the sign and the surrounding parking areas.

88. Applicant proposes several signs for its proposed Project. The principal sign will be a ground sign of 52 square feet that will stand, at its highest point, eighteen feet above the ground. See Exhibit 10.

89. This proposed ground sign will be the principal indicator to the public that the Project Site contains a gas station and restaurant. It will be internally illuminated. While drivers approaching from either direction on Route 7 will see the ground sign as they approach, the light from the sign will not shed onto adjoining properties.

90. This proposed ground sign will be in front of the gas pumping stations, so as to assist with its visibility. Its location is depicted on Exhibit 12, sheet SP2C. While it will encroach into the front yard setback, its encroachment will be no more than the existing ground sign for the former Roadhouse Restaurant, which will be removed during Project construction. The new ground sign will be slightly smaller than the former Restaurant ground sign.

91. The appearance and visibility of the new ground sign will be secondary to the other structures on the property, as depicted in the demonstrative Exhibits 14 and 15. The ground sign will not inhibit visibility on the highway and will not create a harmful glare or distraction for drivers. There was no credible testimony offered that the ground sign will be a detriment to the public welfare.

92. There will also be signs mounted on the northern, southern, and western walls of the building. Each of these wall signs will display the name of the convenience store. All wall signs will be below the eaves of the building roof, as depicted on Exhibit 13. Each of these signs will measure between 12 and 15.7 square feet.

93. A menu board for the proposed restaurant will also be located on the Project Site, at the rear of the building, which will be out of view of passing motorists. This menu board will be located immediately next to the drive-through area and will identify the food and beverages available for purchase via the proposed restaurant drive-through facilities.

### iii. *Site circulation*

94. Two entrance/exit areas for the Project will be available to motorists. See Exhibit 12, sheets SP1C and SP2C. The curb cut to Route 7 on the northern side of the Project Site is intended for use by individual motorists who wish to visit the gas pumping stations, restaurant,

and convenience store. This curb cut will be sufficient in width to accommodate an entrance and two exit lanes: one for vehicles intending to turn right to the north and one for vehicles intending to turn left to the south.

95. The second curb cut onto Route 7 will be located south of the building and gas pumping stations; this southern curb cut is intended to provide a separate access for large trucks, tractor trailers, and other vehicles wishing to access the diesel pumping stations and the four large truck parking spaces. This southern curb cut will have two designated lanes, one each for vehicles entering and exiting the Project Site. See Exhibit 12, sheet SP2C.

96. Providing separate access for trucks and small vehicles contributes to the safety and circulation on the Project Site. If the gas and diesel pumping stations were located in the same area, unwanted conflicts would be more likely to occur between those different types of vehicles.

97. The layout of the gas and diesel pumping stations, as well as the five different parking areas, provides for sufficient areas for cars, trucks, and other vehicles to drive to and through the pumping stations, parking areas, and travelled lanes within the Project Site. The parking spaces and interior travel lanes will be clearly delineated; the pumping stations, while partially screened from the view of Route 7 motorists, will be located in such a manner as to be easily identified by drivers desiring to purchase gas or diesel fuel.

        *iv. Traffic*

98. According to records maintained by the Vermont Agency of Transportation ("VTrans") and testified to by Applicant's expert (Ms. Lisius), there were only two reported accidents on Route 7 in the area of the former Ferrisburgh Roadhouse Restaurant for the period from 2003 to 2007. Mrs. Burdick credibly recalled only one accident during the seventeen years of her restaurant operation, and recalls that that accident was due to driver error, not Route 7 traffic congestion or conditions.

99. Traffic along Route 7 in front of the Project Site has been busy, but relatively safe. VTrans records, as credibly explained by Applicant's traffic expert, estimate that about 11,100 vehicles pass through the Town on Route 7 on an average day. The highest volume of traffic, recognized as the "peak hour" of traffic, occurs between 4:30 PM and 5:30 PM on week days. Applicant's traffic expert credibly estimated that 1,245 vehicles pass by the Project Site during that peak hour.

100. Based upon trip generation tables established by the Institute of Traffic Engineers ("ITE") and her own first-hand observations of existing facilities similar to this Project, Applicant's expert credibly estimated that 118 vehicles will visit the operating Project during that same peak hour, which translates into 236 one-way vehicle trips.

101. These estimates of Project peak hour traffic generation are a bit misleading, however, since Applicant credibly showed that many of the motorists who visit the completed Project will be "pass-by" motorists. "Pass-by" motorists are those who would not be making a special trip for the purpose of stopping at the proposed Project, but rather those who would be passing by the Project Site and choose to stop in. In fact, Applicant's expert, relying again on ITE data and her own first-hand observations of similar existing commercial sites, credibly estimated that up to 63% of the motorists visiting the Project Site would be pass-by motorists. Thus, the proposed Project is unlikely to generate new vehicle trips on Route 7 during the peak hour of highway traffic that would exceed 45 vehicles, or 90 one-way trips. We therefore conclude that the proposed Project will not contribute more than an 8% addition to the existing highest peak hour of traffic.

102. Even though the Project is not expected to be the source of many new vehicle trips, there is some concern about the safe and steady flow of traffic past the Project Site (once completed), especially due to the need of south-bound traffic to stop and make a left-hand turn in order to enter the Project Site.

103. Applicant has therefore offered to improve Route 7 in the vicinity of the Project Site, so that an additional lane may be added and striped, eleven feet in width and located between the two travelled lanes of the highway. After these improvements, southbound vehicles wishing to enter the Project at either curb cut may queue up in this middle lane for a safe left-hand turn into the Project, without interfering with the flow of south-bound traffic.

104. Applicant has offered designs for these Route 7 improvements and has committed to fund such improvements, if it secures all permits for the Project. The highway improvements are detailed on sheet SP8C of Exhibit 12.

105. The flow of traffic on Route 7 will also be assisted by development of the Project, thereby making it less likely that large trucks or tractor trailers will use the shoulders of Route 7 for temporary parking. Drivers of large trucks and tractor trailers currently use the shoulders on either side of Route 7 for parking when they wish to stop to purchase goods or supplies from

21

the convenience store across from the Project Site. See Exhibit 24, slide 3. Once the Project is constructed and operating, drivers of large trucks and tractor trailers may safely and easily turn onto the Project Site and use the permanent parking spaces available by the diesel pump stations.

106. Based upon Applicant's Project plans and its expert's traffic impact analysis, VTrans issued a Letter of Intent and a draft permit to construct the two highway access points and Route 7 left turn lane improvements, a copy of which was admitted as Exhibit 23.

v. *Noise*

107. The noise to be generated from the Project Site will generally be lower than, and therefore difficult to distinguish from, the noises already emanating from the nearby highway and commercial uses in the HC District. The Project components will not cause noises decipherable beyond the boundary lines. Rather, the most significant noises generated on the Project Site will come from the vehicles, particularly large trucks and tractor trailers, that enter and leave the Project Site from Route 7. With the exception of those visiting vehicles, especially as they cross over the boundary line to enter the Project Site, no noise will emanate from the Project Site at a level greater than seventy decibels (70 dBA).

108. The Project-generated noises will not be excessive, especially when measured from the Project boundary lines. Applicant's noise expert, Ken Kaliski, offered credible testimony in this regard, especially in determining that the Project-generated noise, including visiting traffic noise, will rarely exceed 70 dBA at the property lines.

109. The overall noise level at the Project boundary along Route 7 will likely exceed 70 dBA, but that is not because of this Project; rather, such noise levels already exist in the vicinity of the Project. The noise that the Project generates will augment current noise levels produced by existing traffic patterns in the area, especially as large trucks decelerate to enter adjoining commercial properties, including the Vermont Gas Co. convenience store and gas station diagonally across Route 7 from the Project Site.

110. Mr. Kaliski offered a credible summary of his calculations and estimates in his report on the noise impacts that the Project is likely to generate. A copy of his report was admitted as Exhibit 27.

*vi. Hours of operation*

111.     Commercial vehicle traffic, including tractor trailers, flows past the Project Site on a regular basis, during all hours of the day and night.  While commercial traffic is subject to peak and non-peak hours of operation, traffic operates on Route 7 past the Project Site earlier than Applicant's planned opening time of 4:30 AM and after its planned closing time of 11:30 PM.

112.     There was no credible evidence presented as to the benefit to the surrounding area or adjacent neighborhoods of restricting Applicant's planned hours of operation.

113.     Mrs. Burdick credibly testified about receiving deliveries as early as 4:30 AM at the Project Site when she and her husband operated Burdick's Restaurant.  She also testified about other commercial businesses in the area (some no longer operating) opening for business as early as 5:30 AM.

114.     These early and late hours of operation for the Project will have a negligible impact on traffic, since the Project generates few independent trips and gains a majority of its business from passing motorists. These expanded opening and closing times represent hours of relatively low traffic volumes on Route 7.

**d.  Aesthetic components (lighting, landscaping, and site revisions).**

115.     The Project will use a variety of lighting fixtures, in a variety of lighting locations.  While the light emanating from the Project lighting will make the Project visible from off site, no light from the Project fixtures will illuminate areas off of the Project Site.

116.     As noted above, the proposed ground sign will be internally lit, which will make it appear similar (although with different lettering) to the internally lit ground sign in front of the Vermont Gas Co. convenience store and gas station that is diagonally across Route 7 from the Project Site.

117.     Other lighting on the Project Site will use LED bulbs, which will provide a generally consistent, clear-white light that will illuminate the Project Site but will not create a glow in the sky, as does the light from conventional light bulbs.  Examples of LED lighting were provided in Exhibit 25, slides 10, 12.

118.     LED lighting fixtures provide energy-efficient lighting alternatives to florescent, incandescent, and other conventional commercial lighting fixtures, at approximately half the operational cost of conventional lighting fixtures.  LED light bulbs do not contain mercury or

lead, hazardous components often contained in many other commercial lighting bulbs and fixtures.

119. The light that emits from all forms of commercial lighting fixtures is measured in foot candles ("fc"). Applicant credibly showed that its proposed LED lighting fixtures will emit sufficient light to safely illuminate its Project, but that the LED bulbs to be used will do so at a much lower fc level than the conventional lighting at other nearby commercial properties. See Exhibit 25.

120. The light emanating from the LED lighting fixtures on the Project Site will be strongest under the gas and diesel canopies, ranging from a maximum of 9.7 fc under the gas canopy to 5.5 fc under the diesel canopy. The measured level of light emanating from these and other Project light fixtures is reduced to 0.0 fc as one travels away from the canopies and building and towards the Project Site boundaries.

121. Many of the existing commercial properties near the Project Site have bright conventional lights, some of which are left on throughout the evening, even when the businesses are closed. These existing lights often cause glare, sometimes at dangerous levels, for on-coming motorists travelling on Route 7. The lighting fixtures to be installed on the Project will not cause such glare for passing motorists.

122. Applicant proposes to turn off most light fixtures when the gas station and convenience store is not operating, but will leave three exterior lights on throughout the night for security purposes: two lights on the front of the building and one on the rear.

123. No credible testimony was offered that these three exterior lights remaining on for security purposes will have an adverse impact to the area. In fact, such security lights, though minimal, appear to provide only a security benefit to the area.

124. Applicant proposes to add significant plantings and landscaping to the Project Site, including 186 evergreen trees, 162 shrubs, and 12 deciduous trees. These plantings exceed the minimum required under Bylaws §§ 5.11 and 5.18.

125. Applicant presented detailed landscaping and planting plans for the Project Site. Exhibit 25, slide 3 provides a list of the plantings and landscaped areas planned for the Project; sheet 4 of Exhibit 25 provides a depiction of the plantings and landscaping.

126. The Project Site is also partially screened from Route 7 motorists and their passengers by the natural lay of the land and a row of evergreens, many over 25 feet tall, on the property bordering the Project Site to the north.

127. For motorists and their passengers approaching from the south, the Project is on higher ground and is partially shielded from view, due to this higher elevation. Plantings along the Project's southerly border with Route 7 will contribute to this partial shielding.

128. For motorists and their passengers approaching from the north, the Project will not be visible from the Crossroads and the Village District, which represents the northern adjacent area of the Town. The existing evergreens on the northerly neighbors' property will screen the view of the Project, and bushes and other plantings that Applicant proposes to install and maintain along the Project's northern border will contribute to the Project screening.

129. The proposed landscaping and plantings will partially screen the parking areas, vehicles using those parking areas, and the lower portion of the building and pumping stations from the view of passersby, until a passerby approaches one of the entrances to the Project and turns to enter the Project.

130. With the planned landscaping and screening, the visual appearance of the Project, especially from a size and scale perspective, will be diminished and softened.

## Conclusions of Law

Our review in this appeal is directed by (1) the application and supporting materials submitted in support of the proposed Project; (2) the Zoning Bylaws that apply to this application; and (3) the legal issues that have been preserved for our review by Applicant and Cross-Appellants in their respective Statement of Questions. V.R.E.C.P. 5(f) ("an appellant may not raise any question on the appeal not presented in the statement [of questions] as filed"). When conducting a de novo hearing on an appeal from a municipal land use determination, this Court is obligated to hear the evidence presented anew, and "shall apply the substantive standards that were applicable before the tribunal appealed from." V.R.E.C.P. 5(g). Our review, detailed below, is outlined with these directives in mind.

### I. Preliminary Legal Issues (Cross-Appellants' Questions 1–5)

We are thankful that the parties have somewhat simplified our initial analysis with their stipulation concerning the division of the Burdick's remaining property and the merging of the newly-created lots with the adjoining lands of the Llonases and Allandra Farm, Inc., as is

reflected in the post-trial plans and approvals, stipulated into our evidentiary record here as Exhibits 12A and 12B. These exhibits show that the Project's physical, above-grade components are all located on the Project Site and are all sited in the HC District.[14]

Any development proposed in the HC District must secure approval under the applicable conditional use regulations. Bylaws § 4.4(B). Cross-Appellants questioned in both the prior appeal and this appeal whether Applicant's proposed Project is even entitled to be considered for approval as an authorized use in the HC District. We concluded that Applicant, which proposes to construct a combination gas station, convenience store, and restaurant with drive-through facilities, is authorized to seek conditional use approval for the Project as a "gasoline station," a "restaurant," and "retail store," as those terms are used in Bylaws §§ 4.4(B)(9), (19), and (20), respectively. In re Champlain Oil Co., No. 200-10-09 Vtec, slip op. at 6–9 (Vt. Super. Ct. Envtl. Div. July 16, 2010) (Durkin, J.). Both at trial and in their post-trial memoranda, Cross-Appellants renewed their challenges to the consideration of Applicant's Project components as uses for which conditional use approval may be sought. We found no facts received at trial that convinced us to revisit and revise the legal determinations in our prior Decision and Entry Order. We therefore conclude that our prior rulings control these preliminary legal questions, and we reject the assertion contained in Question 5 of Cross-Appellants' Statement of Questions that the HC District does not authorize drive-through or "Convenience, Retail" facilities as permitted conditional uses. (Cross-Appellants' Statement of Questions 1, filed July 26, 2011.) We conclude that the uses of the proposed Project are permissible in the HC District, subject to conditional use approval. Below, we consider whether Applicant's Project, as currently proposed, is entitled to approval under the state enabling statute and the Bylaw provisions that govern conditional use review and approval.

First, however, we address several other preliminary legal issues that Cross-Appellants raise in their Statement of Questions. We address these next, because any one or combination of these Questions could prove fatal to the pending application.

In Question 1, Cross-Appellants ask whether "the new proposal exceed[s] or violate[s] the terms of this Court's Remand Order in Docket No. 200-10-09 Vtec" thereby prohibiting

---

[14] The northeast corner of the Project Site lies, in part, in the RA District. However, no improvements are proposed for this portion of the Project Site. We also recognize that Cross-Appellants assert that the proposed wastewater and stormwater treatment systems should be viewed as causing development activities to occur on adjoining lands, which happen to be located in the neighboring Conservation District. We address Cross-Appellants' assertions below.

review and approval "until a new application is filed, subject to statutory notice?" Id. at 1. In our September 8, 2010 Entry Order, we specifically "**REMANDED** the pending application back to the Ferrisburgh ZBA, conditioned upon Champlain Oil amending its application so that new, undersized, and nonconforming lots are not created by its proposed development plan." See In re Champlain Oil Conditional Use Permit Application, No. 200-10-09 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Sept. 8, 2010) (Durkin, J.) (emphasis in the original).

We cannot conclude that Applicant violated this directive when it sought approval for its revised site plan since the revisions are minor. The Project that Applicant proposed in its revised site plans is nearly identical to that in its original plans; the only material changes made were to conform to the Court's directive that no new lots be created that did not conform to the minimum size requirements of its host zoning districts. The current Project Site is slightly smaller than that originally proposed, and the stormwater and wastewater treatment systems were realigned slightly, so that all Project components are now located on lands entirely within the HC District; the prior design proposed that components of the wastewater and stormwater treatment systems would be located in the Conservation District.

An applicant is afforded the ability to make minor changes to its proposed project without having to begin the application process anew. In cases where the applicant does not change the type of approval sought, this discretion merely affords the applicant an opportunity to address concerns expressed by neighbors and regulators without unnecessarily returning to the first stage of the land use review process.

Our Supreme Court has concluded that amendments to a Project plan may be made to accommodate Project deficiencies, especially when an applicant requests the same type of approval in its amended application. In re Sisters and Brothers Inv. Grp., 2009 VT 58, ¶21, 186 Vt. 103. The Supreme Court opined that, were a new application required in such situations, "site-plan review would become a procedural ping-pong match" that is unnecessary and would lead to repetitive appeals to this Court. Id. In fact, the Supreme Court suggested that demanding a new application when revisions are made to a site plan that do not change the approval requested appears to be a "heads-I-win-tails-you-lose approach" to land use litigation. Id. We cannot approve such an approach and therefore decline to adopt the legal theories posed in Cross-Appellants' Question 1. We conclude that Applicant did not exceed or violate

the terms of this Court's remand order of September 8, 2009 and therefore answer Cross-Appellants' Question 1 in the negative.

By their Question 2, Cross-Appellants ask whether Applicant is proposing additional "Land Development" on adjoining lands located in the Conservation District because its proposed stormwater treatment system may cause stormwater to flow onto those adjoining lands. Cross-Appellants' Statement of Questions, filed July 26, 2011. Cross-Appellants offer no precedent for a definition of land development that includes post-treatment stormwater flows. A main defect in their argument is their failure to acknowledge the current reality: stormwater already flows from the Project Site, following the existing lay of the land, towards the adjoining Class II wetlands and eventually towards Little Otter Creek. Thus, construction of the Project will not create a new flow of stormwater. In fact, due to the proposed on-site treatment system, stormwater will be collected on site, detained, and treated before leaving the completed Project Site. Once constructed, the Project will restrict off-site stormwater flows to significant storm events and will prevent stormwater from reaching adjoining lands until fully treated by the proposed system. Applicant's proposed stormwater treatment system will reduce the flow of stormwater off site and limit its ability to carry harmful sediments. We cannot conclude that the proposed Project, including its stormwater treatment system, will cause development on adjoining lands. We therefore must also answer Cross-Appellants' Question 2 in the negative.

Cross-Appellants' Question 3 appears to be moot, given the parties' subsequent resolution of Cross-Appellants' challenge to Applicant's boundary line adjustment proposals. To the extent that Opponents' Question 3 inquiry is premised upon their assertion that "Land Development" is occurring on adjoining lands by virtue of stormwater flows, we have concluded otherwise, as noted in our above analysis of their Question 2. Due to Applicant's changes to the site plan that locate all Project components in the HC District, we no longer see that the proposed Project contemplates the creation of a lot that does not comply with the minimum lot size requirements of any zoning district, including the Conservation District. We therefore must answer Cross-Appellants' Question 3 in the negative.

We similarly answer Cross-Appellants' Question 4 in the negative, as we find that the proposed Project Site conforms to the minimum lot size requirements for the RA District (5 acres). See Bylaws § 4.2(C)(1).

## II.    Performance Standards (Cross-Appellants' Question 6)

Cross-Appellants, in their Question 6, ask whether the proposed Project conforms with the applicable Bylaw Performance Standards, particularly those regulating noise and lighting, which are codified in Bylaws Article VIII.  Cross-Appellants begin their challenge here by questioning the admissibility of a written report provided by Applicant's expert on noise, Mr. Kaliski.  The Noise Impact Study prepared by Mr. Kaliski (Exhibit 27) was admitted over Cross-Appellants' objection, and Cross-Appellants have repeated their challenge to this Study's admissibility in their post-trial filings.  We remain convinced that Mr. Kaliski provided a sufficient foundation and supporting testimony to render his Study helpful to the Court's analysis.  See V.R.E.C.P. 2(e)(1) (directing that the "Vermont Rules of Evidence shall be followed in all manners [tried before the Environmental Division], except that evidence, not privileged, that is not admissible under the Rules of Evidence may be admitted in the discretion of the [trial] court if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs").

Mr. Kaliski credibly testified that the methodologies he used to estimate the Project-generated noise and its impacts have been used by many professionals in his field for many years.  Noise levels and their impacts can be measured on several levels, including sound and air pressure, and their measurement can reference maximum sound and average sound.  Mr. Kaliski's Study (Exhibit 27) provides a summary of his testimony that the Court found helpful during its deliberations.

Cross-Appellants did not offer much credible evidence to contradict the Kaliski analysis; they chiefly relied upon their belief that the Kaliski Study failed to meet the minimum reliability standards established by the U.S. Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and adopted by the Vermont Supreme Court in State v. Brooks, 162 Vt. 26 (1993).  We remain convinced that the Kaliski Study evidenced an analysis that is reliable and based upon methods of analysis often used and highly respected throughout that area of expertise.  We therefore decline Cross-Appellants' invitation to reverse our trial determination to admit Exhibit 27 into evidence.

Through both his Study and trial testimony, Mr. Kaliski offered convincing evidence that the proposed project will not cause excessive noise at the project's boundary lines and that the noise levels generated by the Project will not exceed 70 dBA at the project's boundary lines.

We therefore conclude that the Project as proposed conforms to the noise Performance Standards contained in Bylaws § 8.1

The lighting for the proposed Project, described above in our Findings ¶¶ 116–124, will not cause glare or the shedding of light past the Project boundaries. Cross-Appellants offered no credible evidence that the proposed Project will cause a nuisance to other property owners[15] or impair the vision of drivers passing by the Project Site. Applicant proposes to use LED lighting fixtures throughout its Project, which will provide site specific lighting, at a much reduced cost, without the inclusion of hazardous materials that are found in most conventional commercial lighting. Additionally, the three lights Applicant proposes to maintain during non-business hours will improve security in the neighborhood without creating a nuisance for neighboring property owners. For all these reasons, the Court concludes that the Project as proposed will not conflict with the Performance Standards for Glare, Lights and Reflection contained in Bylaws § 8.2.

The final Performance Standard—Bylaws § 8.3—prohibits "fire, explosive or safety hazard[s] . . . [on a development that will significantly endanger] other property owners or which results in a significantly increased burden on municipal facilities." No fires, safety hazards, explosives, or explosions are proposed for the Project, and the Court received no evidence suggesting that the Project as proposed would cause such hazards. We therefore conclude that the Project as proposed conforms to Bylaws § 8.3.

For all these reasons, we respond to Cross-Appellants' Question 6 in the affirmative; that is, we conclude that Applicant has met its burden in demonstrating that the Project, as proposed, conforms to the Performance Standards of Bylaws Article VIII.

## III.  Project Signs (Cross-Appellants' Question 7)

Cross-Appellants' Question 7 questions whether "the signage proposed for the project violate[s] Articles V and VII of the zoning ordinance." (Cross-Appellants' Statement of Questions, filed July 26, 2011.) Multiple signs on commercial developments are allowed in the HC District, provided that the proposed signs conform to the general and specific sign restrictions of Bylaws Article VII. Bylaws §§ 7.1, 7.2, 7.7. Where an applicant, as in this case,

---

[15] In fact, Cross-Appellants offered no testimony from neighbors who speculated that the Project lighting would cause a nuisance, nor did they offer trial testimony from any neighbor or Cross-Appellant on this or any other legal issue challenged in this appeal. The only trial testimony offered by Cross-Appellants came from their expert witnesses; the Court did not hear from neighbors or owners of nearby properties as to their individual concerns about the Project.

proposes signage that in the aggregate exceeds fifty square feet, the proposed signs may only be approved if they are found to also conform to the applicable conditional use review criteria. Bylaws § 7.7. For all the reasons detailed below, we conclude that the signs proposed for the Project conform to Bylaws Article VII, including the applicable conditional use criteria.

Under the Bylaws, no permitted signs may "be a detriment to public safety or welfare," "impair public safety, traffic flow or roadway visibility," or "restrict clear vision between a sidewalk and street." Bylaws §§ 7.1(A), 7.2(A), 7.2(B). Additionally, permitted signs must have characteristics placing them "in harmony with the orderly development of the district" and as a "presence secondary to the principal structure of the property." Bylaws §§ 7.1(B), 7.1(C). Applicant proposes to remove the existing ground sign for the former Ferrisburgh Roadhouse Restaurant and replace it with a ground sign that is slightly smaller (by a half square foot), of the exact same height, and no closer to Route 7. The new proposed ground sign will be an aesthetic improvement upon the existing sign and, once the Project building, pumping stations, and canopies are constructed, the proposed ground sign will be similar to and in harmony with other internally illuminated signs in the neighborhood. The ground sign and other Project signs will appear secondary to the Project structures and will assist travelers in identifying that the Project offers gas and diesel sales, a restaurant, and convenience store services. Due to their size and secondary appearance on the Project Site, none of the Project's signs will impair public safety, welfare, traffic flow, or roadway visibility. Since the proposed signs are not located between any sidewalk and adjoining streets, they do not restrict clear vision in those areas.

The ZBA approved the replacement of the existing ground sign with the new ground sign, conditioned upon the new sign "be[ing] no closer to US Route 7 than the preexisting sign (still standing) identifying the Roadhouse Restaurant, the last commercial enterprise to operate on the subject parcel." In re Champlain Oil Co., Inc. Conditional Use Application, No. 09-36, Findings of Fact, Conclusions of Law, and Decision, at 8 (Ferrisburgh ZBA Sept. 16, 2009). No party appealed that specific condition of the ZBA's approval, although we complete our analysis of the proposed signs' compliance with Bylaws Articles V and VII, due to the general challenge presented in Cross-Appellants' Question 7.

The remaining provisions of the sign standards addressing traffic, hazards, safety, and obstructions (Bylaws §§ 7.2(C), (D), and (E)) do not apply to the proposed signs for this Project.

The ground sign will advertise gasoline and diesel sales, as well as the proposed restaurant. Three relatively small oval wall signs, each between 12 and 15.7 square feet, will advertise the convenience store and be located below the roof line on the northern, western (front), and southern walls of the proposed building. There will also be a menu board behind the building to advise drive-through customers of what they may order from the restaurant. The menu board will not be visible from off site, including to the vehicles traveling along Route 7. We regard the menu board as a sign, because it fits the definition for a sign established by Bylaws § 2.2.

These signs will have a combined surface area in excess of fifty square feet; we estimate that the aggregate surface area of all signs, including the drive-through menu board, to total just under ninety square feet. Thus, we have included the proposed signs in our analysis of whether the proposed Project is entitled to conditional use approval pursuant to Bylaws § 9.4. That review is detailed below in the next section. But having concluded, as outlined below, that the proposed signs are entitled to conditional use approval, we further conclude that the Project signs as proposed conform to Bylaws Article VII.

One final legal issue remains concerning the proposed signs and Cross-Appellants' objection to them in their Question 7. Portions of Bylaws Article V (General Bylaws) provide certain restrictions on gasoline and service stations, including on where a ground sign may be located in relation to the pumping stations. See Bylaws § 5.11(H) ("[n]o signs shall extend beyond the pumps, nor exceed eighteen feet in height"). The ground sign is eighteen feet tall, and therefore conforms to the second requirement of this Bylaw. However, that sign is located in front of the gasoline pumping stations and therefore is in conflict with the first requirement of Bylaws § 5.11(H).

The ground sign is a replacement for the preexisting restaurant sign. The location encroaches into the front yard setback, but it does so in no greater manner than the ground sign that now exists on the property. The alignment of the proposed ground sign is subordinate to the Project building, gas pumps, and canopies. The existing sign was more prominent in relation to the former Roadhouse Restaurant. As a replacement to the existing sign, the proposed sign is an improvement, and its non-conformity has been reduced, albeit only to the extent that a portion of the slightly larger existing sign encroaches into the front yard setback and the smaller replacement sign reduces this encroachment.

32

Nonconforming uses and noncompliant structures may be permitted "indefinitely," according to Bylaws § 9.5, but may only be changed if approved by the ZBA. Bylaws § 9.5(A). The ZBA's approval, and hence this Court's approval on appeal, may only be given when a determination is made that the change "is of the same or of a more conforming nature." Id. For the reasons stated above, we conclude that the replacement of the existing ground sign with the proposed ground sign is a change that is permitted under Bylaws § 9.5(A).

We therefore answer Cross-Appellants' Question 7 in the negative: the proposed signs do not violate the applicable provisions of Bylaws Articles V and VII.

## IV. Conditional Use Standards (Cross-Appellants' Questions 8, 9, 10 & 11)

We have previously concluded that the uses Applicant proposes for its Project may be considered for conditional approval. See In re Champlain Oil Co., No. 200-10-09 Vtec, slip op. at 6–9 (Vt. Super. Ct. Envtl. Div. July 16, 2010). In fact, the only uses permitted in the HC District are those that obtain conditional use approval. Bylaws § 4.4(B). The remainder of Cross-Appellants' questions challenge whether the Projects meets the Town's conditional use standards. As we embark upon an analysis of whether the uses proposed for this Project conform to the conditional use standards of Bylaws § 9.4, we additionally consider —as noted above—the proposed signs, since their aggregate size exceeds fifty square feet and therefore requires conditional use approval, pursuant to Bylaws § 7.7(B). Cross-Appellant's Questions 8, 9, 10, and 11 overlap in content to such an extent that we address them simultaneously by analyzing all aspects of the conditional use standards applicable in this case.

### a. General Standards.

The Town has chosen to enact conditional use criteria, as authorized by the enabling legislation now found in 24 V.S.A. § 4414(3),[16] which requires that the "general standards [adopted by the municipality] shall require that the proposed conditional use shall not result in an *undue adverse effect*" on several enumerated criteria. Id. (emphasis added). Bylaws § 9.4(A) requires in its iteration of the Town's general standards for conditional uses that "the proposed use will not "*adversely affect*" six numbered criteria. These two italicized phrases are terms of art

---

[16] In citing to the enabling provisions for conditional use review, both Applicant and Cross-Appellants cite to 24 V.S.A. § 4407. But §§ 4404 through 4409 were repealed by the Permit Reform Act of 2004. That Act reorganized the municipal and regional planning provisions of title 24, relocating the conditional use enabling provisions to § 4414(3). We are not sure why the parties refer to the former law; we refer to the applicable provisions of the current law for guidance in our analysis. But as noted below, these distinctive phrases may have no practical difference.

in land use regulation and litigation. The former has been the subject of much discussion by the former Environmental Board, this Court, and the Vermont Supreme Court and is often referred to as "the Quechee test," a named derived from the review of a specific permit amendment application for a development in Quechee, Vermont. See Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order, at 17 (Vt. Envtl. Bd. Nov. 4, 1985). This Court provided an overview of the history and terms of the Quechee test in its merits decision on a Middlebury-area development. See In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 14–15 (Vt. Envtl. Ct. Feb. 15, 2008).

Many municipalities continue to employ the "adversely affect" standard that was required by the prior version of the enabling law, codified in the former 24 V.S.A. § 4407(2). The Supreme Court has held "that the adverse effect test must be applied reasonably to prohibit only *substantial and material adverse effects*." In re Miller, 170 Vt. 64, 69 (1999) (citing In re Walker, 156 Vt. 639, 639 (1991) (mem.)) (emphasis added). While the parties here spent much time, both at trial and in their post-trial memoranda, debating the proper application of either one of these standards, we conclude that, particularly because of the precedent established by the Supreme Court, the two terms represent different terms without much distinction.

Alternatively, the Court in Miller helped define the term often used in municipal regulation, while the Quechee test provides a helpful foundation for determining when a project's impact may be adverse in the context of a state land use (Act 250) permit application. The former Environmental Board defined an adverse use by asking whether "the proposed project [is] in harmony with its surroundings—will it 'fit' the context within which it will be located?" Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985). The Board further offered that a development that would be "unfavorable, opposed, [or] hostile" should be deemed adverse. Id. at 17 (quoting Re: Brattleboro Chalet Motor Lodge, Inc., No. 4C0581-EB, Findings of Fact, Conclusions of Law and Order, at 6 (Vt. Envtl. Bd. Oct. 17, 1984)).

In addition to this definition of the term "adverse", the Supreme Court has determined, in the context of a municipal land use application, that only those projects that are deemed to have a substantial and material adverse effect shall be denied conditional use approval. In re Walker, 156 Vt. at 639. We therefore employ portions of both the Quechee and Miller

34

definitions in our analysis of the proposed Project and its impacts on the General Standards enumerated in Bylaws § 9.4(A).

1. *Capacity of existing or planned community facilities.*

Under Bylaws § 9.4(A)(1), we conclude that the proposed Project will not have an adverse effect on the capacity of existing or planned community facilities. The Bylaws define a community facility as "[a]ny meeting hall, place of assembly, museum, art gallery, library, school, church or other similar type of establishment which is not operated primarily for profit, excluding government facility." Bylaws § 2.2. Cross-Appellants assert that the Project will adversely affect community facilities generally, including area highways. We disagree. Applicant has incorporated and will finance modifications to Route 7 that will ease the flow of traffic past the Project Site. Much of the traffic that will use the Project will be from vehicles that are already passing by the Project for other purposes; the new traffic that the Project generates will represent a small fraction of the average of 11,100 vehicles that already pass the Site daily along Route 7. The credible testimony did not reveal any existing or planned community facilities that would be impacted by this Project in any distinguishable or incremental way. We conclude that the Project's impact on existing or planned community facilities will not be adverse.

2. *Character of the area affected.*

As detailed in our Findings ¶¶ 19–39, we conclude that the proposed Project is not significantly larger than other commercial properties in the area. It will provide services much like the services already provided by the Vermont Gas Co. facility across Route 7 and the gas station/convenience store just to the north of the Village District. The negligible impact of these existing commercial operations upon the character of the area contributes to our conclusion that the proposed Project, similar in nature, will not have an adverse impact upon the character of the area affected.

The Project's proposed signs are similar to the signs at these existing commercial establishments; the proposed signs will be secondary to the other Project structures and will appear as such. For all these reasons, we conclude that the Project complies with the Bylaws § 9.4(A)(2); it will not adversely impact the character of the area affected.

3. *Traffic on the roads and highways in the vicinity.*

Applicant has incorporated and will finance modifications to Route 7 that will ease the flow of traffic past the Project Site. Much of the traffic that will use the Project will be from

vehicles that are already passing by the Project for other purposes; the new traffic that the Project generates will represent a small fraction of the average of 11,100 vehicles that already pass the Site daily along Route 7. The appearance and visibility of the new ground sign will be secondary to the other structures on the property, and will not inhibit visibility on the highway, create a harmful glare or distraction for drivers, or otherwise lessen the safety of the streets. Neither the wall signs below the eaves of the building roof nor the drive-through menu sign in the back of the building will impact traffic.

We conclude that the Project and all its components, including the proposed signs, will not have an adverse impact under § 9.4(A)(3), since it will not adversely impact traffic on the roads and highways in its vicinity.

### 4. *The Town Plan and Bylaws in effect.*

We now turn to whether the Project adversely affects the Town Plan and Bylaws. The parties spent much time at trial and in their post-trial memoranda discussing the ways the Project and its proposed uses conform or fail to conform to the development standards discussed in the Town Plan and Bylaws, pursuant to the General Standard contained in subsection 9.4(A)(4). This devotion of time is appropriate, as this is perhaps the most significant issue in our conditional use analysis. By their Question 9, Cross-Appellants assert that the proposed Project cannot receive approval because it does not conform to aspects of the Bylaws and Town Plan. See Bylaws § 4.4(A); Town Plan § 4.3(G). Before we address whether the Project actually conforms to or contradicts those purpose provisions, we must address whether these—or for that matter, any other purpose provisions in the Bylaws or Town Plan—may be read as a regulatory restriction. We conclude that when a zoning bylaw or town plan provision consists only of aspirational language, it does not impose a regulatory restriction, even though purpose provisions in zoning bylaws provide helpful context and direction on what the regulatory provisions are intended or planned to accomplish. See In re Rivers Development, LLC, Nos. 7-1-05 Vtec and 68-3-07 Vtec, slip op. at 10 (Vt. Super. Ct. Envtl. Div. Jan. 8, 2008) (Durkin, J.) (stating that regulatory language directing what a project "should" include or consider is aspirational and not mandatory in nature).

Much of land use litigation considers the limits of the control a government may exert over landowners' future use of their property. Our Supreme Court has directed that since land use regulations are in derogation of private property rights, they "must be construed narrowly

36

in favor of the land owner." In re Toor & Toor Living Trust NOV, 2012 VT 63 ¶9 (citing In re Appeal of Weeks, 167 Vt. 551, 555 (1998) & In re Vitale, 151 Vt. 580, 584 (1989)). One interpretive tool for following the directive repeated in Toor, Weeks, and Vitale is to require that regulatory language used to evaluate a property owner's proposed development provides "sufficient conditions and safeguards" to guide applicants and decision makers on how the proposed project is to be judged. Town of Westford v. Kilburn, 131 Vt. 120, 125 (1973). Even though the precedent announced in Kilburn is nearly forty years old, the Supreme Court in Toor cited to its precedent approvingly. Toor, 2012 VT 63, ¶9.

Regulatory language that directs what "should" occur in a particular area is aspirational. Such language, without more specific direction, cannot provide the mandatory standards that are required for regulatory provisions as directed by the Toor, Weeks, and Kilburn Courts. See also 24 V.S.A. § 4303(26) (stating that "'[s]hould' means that an activity is encouraged but not mandated"). Nevertheless, we decline to conclude, as Applicant suggests, that the aspirational language in the Bylaws or Town Plan must be ruled invalid or unconstitutional. Aspirational language in the Bylaws and Town Plan provides a helpful context for the Town's desires for future development. But such aspirational language, while helpful, does not define the mandatory requirements for development to be approved in the HC District.

We therefore must conclude that the purpose provisions in the introductory paragraph of Bylaws § 4.4(A) and the Town Plan's instruction to limit development along Route 7 in the vicinity of the Project Site to "small-scale" uses "typical of a 19th century highway crossroads area" do not establish regulatory standards specific enough to judge the proposed Project. Town Plan § 4.3(G).

Before we leave the discussion of purpose provisions and their import, we note that both parties, not surprisingly, most often cite to the portions of the purpose provision for the HC District that seem to favor their respective argument. In our analysis, we read the purpose provision in its entirety, as the Supreme Court has repeatedly directed. In re Pierce Subdivision Application, 2008 VT 100, ¶ 24, 184 Vt. 365 (citing In re Handy, 171 Vt. 336, 348-49 (2000)) (a reviewing court should "consider the entire ordinance when evaluating whether it provides sufficient guidance to a decision-making body"). The Purpose subsection for the HC District

provides supportive language for both the Applicants and Cross-Appellants. In its entirety, the Purpose subsection suggests that:[17]

> It is the primary policy of this district to provide an area to serve highway oriented businesses and highway uses. The size of the commercial uses should be restricted to protect the residential character and traffic access in this and adjoining districts. It is recommended that access to all highway commercial areas be limited in number, if practical, by use of multi-lot access roads, to promote safety and to ease traffic flow on public roads. A minimum lot size of two (2) acres is required for these areas.

Bylaws § 4.4(A).

The proposed Project establishes businesses (gas station, convenience store, and restaurant) that will serve the highway-oriented travelers that pass through the HC District. The impact of the proposed Project, especially when considering the screening effect of the landscaping, plantings, and lighting Applicant proposes, is similar to the existing commercial businesses that occupy many of the properties in the HC District; its size and access points will not negatively impact the residential character in this or the adjoining Village District. In fact, similar facilities exist to the south and north of the Village District and have not been shown to negatively impact the residential character of the area.

Interestingly, although this Purpose subsection recommends that the size of commercial uses should be "restricted" and highway accesses be "limited," Bylaws § 4.4(A), the Bylaws contain no specific provisions that effectuate these stated purposes. In the absence of those specific provisions, we can only conclude that while the Town and its inhabitants have stated these desires for land uses in the HC District, they have not yet chosen to implement those desires in the regulatory portions the Bylaws. We are left to wonder how to judge whether a proposed commercial use is too large and whether any new highway access points are "practical." The phrase from Town Plan § 4.3(G) that suggests that "only small-scale commercial enterprises and mixed uses typical of a 19th century highway crossroads area" be authorized in the Town's highway commercial areas is not repeated or defined in Bylaws § 4.4 governing the uses allowed in the HC District. In the absence of these specific standards in the

---

[17] We also include this analysis of the Project's conformance to the purpose provisions for the HC District because we are directed to do so in connection with our determination of whether the Project is entitled to conditional use approval. Bylaws § 9.4 provides, in part, that conditional use review "shall specifically include consideration of the stated purpose of the district in which the proposed use is to be located." Id. Our review here is also conducted for that purpose.

Bylaws, we are left with the character of the existing area to guide us in what has been permitted in the HC District.

Cross-Appellants often characterized the proposed Project as a "suburban strip mall" type of development. We disagree. This term appeared to be used to refer to the Project derisively, although little definition was offered for the term. From the Court's experience, the term "suburban strip mall" development has often been used to refer to a development that hosts multiple retail and commercial uses in a long, single-story facility, usually on the outskirts of a suburban area, and often criticized for its aesthetic deficiencies and for encouraging the sprawl of development into less developed areas. The Applicant's Project has none of these attributes or appearances. It does not have the appearances of a suburban strip mall; it is situated in a zoning district established to serve highway-oriented businesses, in an area already developed with such businesses. Applicant's suggested improvements to Route 7 will ease the flow of highway traffic past the Project. The Project Site complies with the minimum lot size requirements for the HC District. Given all these attributes, we conclude that the proposed Project complies the with the general purpose provisions for the HC District

As our Findings detail, the Project complies with all the applicable dimensional requirements and other General Bylaw provisions. See Bylaws § 4.4(C) and Article V. We also conclude that the proposed Project is in conformance and not in conflict with the Purposes established for the HC District.

In reviewing any possible material and substantial adverse effects on Town Plan provisions, the parties focused attention upon the Land Use Areas and Policies provisions relating to the Highway Commercial and Civic Center Areas. Town Plan §§ 4.3(G), (H). These provisions note that a "large modern gas station" is already operating in the North Ferrisburgh section of the Highway Commercial Areas. Id. There was no testimony that this already existing facility, which is similar to the proposed Project, has had any adverse impact upon that area or the adjoining Civic Center Area. There was also no testimony offered that the Vermont Gas Co. gas station and convenience store, located across Route 7 from the proposed Project and just a short distance from the Civic Center Area, has had any adverse affect upon its host or adjoining zoning districts. From these illustrations, we cannot discern that the proposed Project will have an adverse affect upon the Town Plan and the goals it embodies.

Cross-Appellants' expert, Ms. Vissering, did a commendable job of emphasizing the Plan's stated purpose for the Highway Commercial Areas, specifically that:

> All uses in this area should be conditional, and include only small-scale commercial enterprises and mixed uses typical of a 19th century highway crossroads area, with varied lot sizes, landscaping and setbacks such that views of open lands behind may be obtained. Infrastructure is limited in these areas.

Town Plan § 4.3(G). We note that Applicant's proposed development is subject to conditional use review and results in varied lot sizes that still maintain a significant parcel: the resulting 179± acre parcel to be maintained by Allandra Farm Inc. While the view of these currently open lands will be partially obscured by the proposed Project, views of the Allandra Farm land will remain from several vantage points.

Cross-Appellants, principally through Ms. Vissering and her testimony, emphasized the discord between what the proposed Project represents and what the Town Plan describes as "small-scale commercial enterprises and mixed uses typical of a 19th century highway crossroads area." Id. We have difficulty interpreting this portion of the Town Plan, since it appears to conflict with the development that the Town has already allowed to occur in its Commercial Highway Areas.[18] As noted above, this portion of the Town Plan does not provide mandatory language or guidance specific enough to be imposed as law, and the Bylaws lack any specific guidance implementing the Town Plan's language.

The Town Plan notes that "the visual character of this entrance to the town [is a] concern that should be addressed by the town's regulations to maintain historic character." Town Plan § 4.3(G). The developments that have been allowed to occur in the Highway Commercial Areas, as well as an absence of specific standards in the Bylaws that would impose these restrictions, make this Court question the weight and effect of this stated, but unattained goal to turn the developmental clock back more than one hundred years. We are at a loss to determine how this term may be implemented, without specific standards, definitions, or commercial examples.

The proposed Project will provide a mix of commercial services. While it is larger than some existing commercial properties, it will not be larger, either in retail space or parking area,

---

[18] For example, while Mailloux's Honey Gardens store might be "typical of a 19th century highway crossroads area," we doubt that businesses such as Mid-State Sports, the Dock Doctors, Vermont Energy Co. gas station and convenience store, the Sky View Motel, Eriksen's Marine, and BC Motorsports, and the large modern gas station in the North Ferrisburgh section of the Highway Commercial Areas could be classified as such.

than some other existing businesses. Applicant has done a commendable job of designing landscaping and planting in excess of what the Bylaws require; the landscaping and plantings will screen the project for most Route 7 travelers, and the only clear view of the Project will emerge when a motorist commits to entering the Project Site.

For all these reasons, we conclude that the proposed Project, including the proposed signs, will not have a substantial and material adverse effect upon the Town Plan and existing Bylaws. We therefore conclude that the Project conforms to Bylaws § 9.4(A)(4).

5. *Utilization of renewable energy resources.*

Applicant proposes to use LED bulbs and fixtures for the Project lighting, which will offer sufficient lighting while using reduced energy resources. The proposed lighting will provide sufficient illumination under the pumping canopies and inside the building, but will not produce unnecessary glare or shed light beyond the property boundaries. The project therefore is in conformance with the General Standards contained in Bylaws § 9.4(A)(5).

6. *Appropriate use or development of adjacent properties.*

The project will not interfere with the continued use of adjacent properties. The view of the Project will be screened by Applicant's plantings and the existing evergreens on the northern neighbor's property. Applicant has orchestrated the transfer of the Burdick's remaining land to a nearby farming operation, thereby fostering that use and allowing for adjacent lands to remain undeveloped, subject to the desires of that owner and the Town's future development determinations. No stormwater or wastewater will flow from the Project Site onto adjoining lands without first being treated, pursuant to the applicable ANR permits. We cannot discern an adverse impact upon the use or development of adjoining lands. We therefore conclude that the Project as proposed conforms to Bylaws § 9.4(A)(6).

**b. Specific Standards.**

Subsection (B) of the conditional use provisions of the Bylaws authorizes the ZBA, and this Court on appeal, to "impose . . . other conditions found necessary to protect the best interests of the surrounding property, the neighborhood or the town as a whole." Bylaws § 9.4(B). The conditions may refer to (1) minimum lot size; (2) distance from adjacent or nearby uses and height or lot coverage that may obstruct natural, historic or agricultural lands; (3) environmental impacts detectable at the development's boundaries that are obnoxious or excessive; (4) minimum off-street parking and loading facilities; (5) landscaping and fencing; (6)

design and location of structures and service areas; and (6) size, location and design of signs. Id. We address these Specific Standards in turn.

We first note that this project has been in a planning and review stage for several years. The ZBA imposed fifteen[19] conditions on its approvals of the Project, both in 2009 and 2011, eight of which Applicant has challenged in this appeal. Whether those challenges are successful is discussed in the section below. But what is indisputable now is that any permit that may issue at the conclusion of these proceedings must incorporate the conditions imposed by the ZBA that Applicant chose not to contest.

Our prior analysis already includes many of the legal issues raised in the Specific Standards contained in Bylaws § 9.4(B). We therefore offer the following summary, relying upon the more detailed analysis above.

The Project Site exceeds the minimum lot sizes for its host zoning districts. The development of this Project will result in the majority of the land now held by Mrs. and Mr. Burdick being merged with the land belonging to an adjacent farming operation. We see no need to impose conditions on the project concerning lot size, beyond those that Applicant has offered in its revised site plans. We therefore conclude that the Project conforms to Bylaws § 9.4(B)(1).

Applicant has designed the Project so as to cluster the above-grade improvements on a small portion of the Project Site and to preserve the remaining lands for merger with other lands of Allandra Farm, Inc. The proposed building will obstruct some views and vistas, but many views and vistas of the adjacent undeveloped lands will remain from and across the Project. In fact, for the north-bound traveler, the building will have little to no impact on views and vistas. For the south-bound traveler, the Project will not be visible, nor will it obscure adjacent views, until the traveler is adjacent to the Project. This effect is enhanced by the plantings and landscaping Applicant has proposed in addition to the existing row of evergreens near the adjoining neighbor's shared boundary line. There were no wildlife habitats, productive woodlands, or historic sites identified as being impacted by the proposed project. We therefore conclude that the Project conforms to Bylaws § 9.4(B)(2).

---

[19] The ZBA's September 9, 2009 approval contains 14 numbered conditions and an un-numbered paragraph labeled "**Additional Conditions**." The ZBA's June 1, 2001 approval after remand incorporated all of the ZBA's 2009 conditions by reference.

We have already considered whether the Project will cause nuisances, including excessive noise; the facts reveal that the Proposed Project will not cause the other "obnoxious or excessive" impacts itemized in Bylaws § 9.4(B)(3). In addition, the wastewater and stormwater permits issued by ANR provide credible proof that the Project as proposed will treat all "liquid or solid refuse or waste" on the Project Site. Cross-Appellants offered no credible refutation of the presumption provided by the ANR permits. We therefore conclude that the Project conforms to Bylaws § 9.4(B)(3).

The Project as proposed provides twenty more parking spaces than the minimum required by the Bylaws. The parking as proposed is mostly located in the rear and to the side of the building; only eight spaces will be located in the front of the building and many of the parking spaces, including those for large trucks, will be at least partially screened by the proposed landscaping and plantings. There will be sufficient areas to the rear and sides of the building for vendors who visit the project to off-load their goods. We therefore conclude that the Project conforms to Bylaws § 9.4(B)(4).

We have already considered the extensive landscaping and plantings that Applicant proposes for the Project Site. No party proposed that fencing is needed. We therefore see no need to include conditions regarding fencing and landscaping, beyond what Applicant has already proposed to do. We therefore conclude that the Project conforms to Bylaws § 9.4(B)(5)

Applicant has proposed structures and service areas that will serve the visiting public well. While the buildings, canopies, pumping stations, and parking areas will be larger than some nearby commercial operations, the proposed Project is aesthetically well-planned and not as large as some other nearby commercial operations. Cross-Appellants' expert (Ms. Vissering) admitted on cross-examination that she "had no problem with" the building, although she did propose that Applicant be required to relocate the gas pumping stations behind the building. Ms. Vissering also complained that the project would represent "visual clutter." We disagree. This Project will have softer aesthetic impacts than many of the existing nearby commercial properties due to the building and canopy colors, roof architecture, and landscaping and plantings. No other suggestion was received that, in the Court's assessment, would improve upon this already well-planned commercial site. We see no need to include conditions that would alter Applicant's building and service area plans. We therefore conclude that the Project conforms to Bylaws § 9.4(B)(6).

We have also already addressed the size, location, and design of the project signs, which are designed to be secondary and have a subordinate appearance to the Project structures. The ground and wall signs are appropriately sized to provide an indication of the businesses at the Project Site, but are not so large as to be glaring or out of character with other nearby signs, especially the ground sign at the Vermont Gas Co. facility across Route 7. The menu board at the rear of the building will advise the drive-through restaurant customers what food items they may order, but will not be visible from the front of the building, or from Route 7. We see no need for additional conditions regarding the project signs. We therefore conclude that the Project conforms to Bylaws § 9.4(B)(7).

For all these reasons, we conclude that the project as proposed conforms to all the General and Specific Standards of Bylaws § 9.4 and is therefore entitled to conditional use approval.

This concludes our analysis of the legal issues raised in Cross-Appellants Statement of Questions. Since we have concluded that the Project is entitled to approval, we now proceed to a review of the conditions Applicant challenges in its Statement of Questions.

## V.      Additional Conditions Imposed Upon Project Approval (Appellants' Questions challenging conditions 1–4 & 6–9 imposed by ZBA)

Applicant poses a unified Question in its Statement of Questions. The sole purpose of Applicant's appeal appears to be the removal of Conditions 1–4 and 6–9 that the ZBA first incorporated in its conditional use approval for the Project on September 16, 2009, and then incorporated by reference when the ZBA again granted conditional use approval on June 1, 2011, after remand from this Court.

The nature of this Court's review is de novo, since the Town has not chosen to conduct its land use review proceedings on-the-record, pursuant to 24 V.S.A. § 4471(b). Compare V.R.E.C.P. 5(g) with 5(h). Thus, we conduct an evidentiary hearing "anew" and disregard the determinations that were made by the appropriate municipal panel below that are now on appeal. In re Poole, 136 Vt. 242, 245 (1978). We conduct our legal analysis here without regard to the conditions that the ZBA imposed and that Applicant has appealed; we render our determination of what additional conditions, if any, to impose upon any approval based upon the evidence presented in the de novo hearing.

44

Given the length of these proceedings, in part the result of the court-ordered remand, and the revisions Applicant has made to its site plan, some of its challenges to the appealed conditions appear stale or moot, as noted below. Nonetheless, for ease of the reader, we use Applicant's Statement of Questions and the eight enumerated conditions as an outline for this final section of our legal analysis.

The ZBA's Condition 1 directed that there "shall be no diesel pumps associated with the project." (Applicant's Statement of Questions 2, filed July 25, 2011.) We heard few specific complaints about the diesel pumps; Cross-Appellants more often complained about the general size of the project. As suggested by Applicant's traffic expert, many of the Project's customers will be "pass by" customers, including tractor-trailer drivers and others desiring to purchase diesel fuel at the Project. Thus, such Project visitors will have minimal or no new impact to the area. Additionally, Applicant's revised site plan provides for many plantings and landscaping that will offer screening for the diesel pumping stations, including a landscaped and vegetated island area with additional plantings. Route 7 travelers from the south are unlikely to see the diesel pumping stations and the vehicles parked at those stations; much of the canopy above the diesel pumping station will also be screened to north-bound travelers.

Removing the diesel pumps from the project will have little influence upon the project's impacts, other than a reduction in the revenues the Project generates (an impact the Bylaws do not authorize us to consider). We do not discern a material reason to remove diesel sales from the proposed Project. We therefore **VOID** Condition 1 from the ZBA's approval.

Condition 2 imposes certain collecting and reporting conditions on the construction and operation of the proposed wastewater treatment system. Applicant appears to have adopted the "pre-treatment" requirement imposed by the ZBA, since the project plans now call for a Micro-Fast bio-digestion system to be used to "pre-treat" the wastewater collected from the project. The ANR approval of the Project's wastewater treatment system requires Applicant, its successors, and assigns to maintain and regularly inspect the wastewater system, and to make regular reports on its operations to ANR officials who have an expertise in the operation of commercial wastewater systems. See Exhibit 16 at 2–3. We received no testimony on the added benefit to requiring Applicant to also make separate reports on the wastewater system to Town officials and we therefore have no basis for imposing such a condition on the project as it is now planned.

The ZBA approval includes a separate paragraph labeled "**Additional Conditions**" which is not subject to our review, since no party specifically referenced it in their respective Statement of Questions.  This paragraph provides that the proposed Project "shall be completed in accordance with such approved plans and conditions."  In re Champlain Oil Co., Inc. Conditional Use Application, No. 09-36, Findings of Fact, Conclusions of Law, and Decision, at 9 (Ferrisburgh Zoning Bd. of Adjustment, Sept. 16, 2009).  This condition specifically references Applicant's former plans and some terms and conditions vacated by this Court's decision.  We will therefore impose a supplemental condition: that the "**Additional Conditions**" provision be revised to reflect that the Project must be completed in accordance with Applicant's revised plans and this Court's modifications and approvals.  We see no further need, after this revision, for the ZBA's Condition 2 and therefore **VOID** it as well.

Condition 3 prohibits the use of a drive-through "component" to the proposed restaurant, but authorizes a "drive-in" component.  (Applicant's Statement of Questions, filed July 25, 2011.)  We do not comprehend this distinction, but in any event, we have determined that the proposed restaurant may have drive-through facilities.  We therefore **VOID** Condition 3.

Condition 4 provides that the hours of operation shall be limited to 5:00 AM to 10:00 PM.  Given the trial testimony of existing and past practices for area commercial operations, we do not see the material benefit of restricting Applicant's operation to less than its suggested times of 4:30 AM to 11:30 PM.  We therefore **REPLACE** Condition 4 with a condition limiting the hours of operation to no earlier than 4:30 AM and no later than 11:30 PM.

The next condition Applicant challenges, Condition 6, limits the project's signs to a total of 84.5 square feet, including the menu board at the rear of the building.  For the reasons already stated above, we **REVISE** this Condition to incorporate the total square footage shown on Applicant's revised site plans (Exhibit 12), including the rear menu board.  We estimate this total square footage to be just under 90 square feet, but direct that the Project plans admitted at trial control the specific sign areas.

Condition 7 requires that the project be "re-engineered so as to effectively capture all water run-off in all seasons so that all water is channeled to constructed catch-basins that drain

46

to the GOWS."[20]  (Applicant's Statement of Questions, filed July 25, 2011.)  It appears that Applicant's revised site plans accomplish this, since the plans include a GOWS component to its ANR-approved stormwater treatment system.

Applicant's plan may only include the collection of stormwater from the Project's paved areas, particularly in the vicinity of the pumping stations.  We received no trial testimony about the need for stormwater collection and treatment beyond these areas and do not see the need, especially in grassed areas that may be within the Project Site that will not be actively used.

Condition 7 continues with a construction certification requirement to Town officials. Applicant, its successors and assigns are already under an obligation to make such a certification and regular reports to ANR officials, and to allow ANR officials to conduct inspections at their discretion.  Exhibit 17 at 2.  We do not see the benefit of requiring Applicant to make additional certifications and therefore **REVISE** Condition 7 to require that Applicant construct its stormwater treatment system pursuant to the ANR-approved plans and to copy Town officials with any certifications filed with ANR, pursuant Permit #6563-9015.

Condition 8 imposes limits on the levels of light (by foot candles or "fc") the Project emits that are slightly different than the light emissions estimated by Applicant in its revised plans.  Some of the fc levels in Condition 7 are similar to Applicant's plans; some allow for more light to be emitted, especially at the perimeters of the property.  We see no benefit to imposing this additional Condition, especially since Applicant's plan call for less illumination spilling at the Project's boundaries.  We therefore see no need for such a condition, beyond the general condition that requires Applicant to construct and operate the Project as proposed in its revised Plans.  We therefore **VOID** Condition 8.

Lastly, we turn to Condition 9, which requires that all project lights be on motion sensors and that no lights be left on after the close of business.  Applicant proposes that it be allowed to leave three exterior lights on after business hours for security purposes.  We have already concluded that allowing Applicant to keep these lights on for security purposes offers a benefit and no identified detriment to the area.  We received no trial testimony concerning the benefit of requiring Applicant to use motion sensors to activate the project lighting.  In fact, we did not learn at trial of any area business that has volunteered or been required to use motion

---

[20] "GOWS" are grit, oil, and water separators.  The proposed Project includes an underground GOWS component to the stormwater treatment system.  See Exhibit 12, sheet D6C.

sensors to control its lighting.  We therefore **VOID** Condition 9.  Applicant remains restricted, pursuant to its revised Project plans, to leaving on no more than three lights during non-business hours, for security purposes.

### Conclusion

For all the reasons more fully discussed above, we **GRANT** Applicant conditional use approval for its proposed Project, which consists of a gas and diesel fueling station, convenience store, restaurant that may include drive-through facilities, and on-site wastewater and stormwater treatment systems, located on a 9.7± acre parcel of land on the eastern side of U.S. Route 7 in the Town of Ferrisburgh to be conveyed to Applicant, all according to its revised site plans (Exhibit 12) and supporting documentation admitted into evidence in these appeal proceedings.  This approval is conditioned upon several conditions, including those contained in the ZBA's first approval of September 16, 2009 that were not appealed here (i.e., Conditions 5, 10–14, and the unnumbered condition titled "**ADDITIONAL CONDITIONS,**" as supplemented by this Decision).  We specifically note that, for the reasons detailed above, the Court has concluded that ZBA Conditions 1–3, 8, and 9 must be **VOIDED**.  We **REVISE** Conditions 4, 6, 7, and the unnumbered "**ADDITIONAL CONDITIONS**" paragraph, as reflected above.

We remand these proceedings to the Town of Ferrisburgh Zoning Administrator, solely to complete the ministerial act of issuing a zoning permit in conformance with this Decision and the ZBA conditions not voided here, but including the conditions revised by this Decision.  The Zoning Administrator may use his discretion as to how best to number the conditions that remain as a consequence of this Decision.

A Judgment Order accompanies this Decision.  This completes the current proceedings before this Court concerning this appeal.

Done at Newfane, Vermont, this 10th day of October 2012.

_____
Thomas S. Durkin, Environmental Judge

48